J-S05017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: S.T., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: L.T., MOTHER, | |
| | No. 1375 MDA 2015 |

Appeal from the Decree July 10, 2015
In the Court of Common Pleas of Lancaster County
Orphans' Court at No(s): 2014-1806

BEFORE:  BENDER, P.J.E., SHOGAN, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED FEBRUARY 26, 2016**

L.T. ("Mother") appeals from the decree granting the petition filed by the Lancaster County Children and Youth Social Service Agency (the "Agency") to involuntarily terminate her parental rights to her daughter, S.T. or S.A.T. ("Child"), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1]  Mother's counsel, Attorney Catharine I. Roland ("counsel"), has filed a petition for leave to withdraw as counsel and a brief pursuant to ***Anders v. California***, 386 U.S. 738, 744 (1967).  We grant counsel's petition to withdraw and affirm.

---

[*]  Retired Senior Judge assigned to the Superior Court.

[1]  Although the July 10, 2015 decree states that the orphans' court terminated Mother's parental rights pursuant to section 2511(a)(6), it is clearly a typographical error.  ***See*** Orphans' Court Memorandum Opinion, 7/10/15, at 1, 5, 7.

The orphans' court has set forth the relevant factual and procedural history of this case as follows:

SAT is a minor child, born [in 2006], in Lancaster County, PA. She currently resides in the Kinship Resource Home of her maternal great-uncle and great-aunt, [D.P and L.P] (hereinafter "Resource Family").

The birth mother of SAT, [L.T.] (hereinafter "Mother"), was born June 9, 1983. She currently resides at New Life for Girls (hereinafter "NLFG"), a faith-based drug and alcohol rehabilitation facility in Dover, PA. Mother was present at the hearings and represented by counsel. She is contesting termination of her parental rights and testified at the hearing on March 24, 2015.

* * *

The Agency's long history with the family began in 2008, after the Agency received reports concerning Mother's substance abuse, inappropriate housing, and emotional maltreatment of SAT. Referrals were also received in January 2009 and November 2010. The 2009 case was screened out. After conducting a home visit in 2010, the Agency discovered the home had no heat or electricity, there was no food in the home and the refrigerator contained mold. The bathtub was filled with dirty dishes. A voluntary Safety Plan was put into place in November 2010 and was revised in December 2010. The maternal grandparents were involved in the Safety Plan to assure SAT's safety and welfare. Mother's initial level of cooperation with the Agency waned and a Petition for Legal Custody was filed January 21, 2011. After numerous continuances, a Shelter Care hearing was held on April 5, 2011. SAT was placed in the temporary legal custody of the Agency, and the temporary physical custody of the maternal grandparents. The Adjudication hearing was scheduled for May 3, 2011. However, on April 25, 2011, Mother violated the Safety Plan and the Agency filed a Petition for Temporary Custody and requested immediate placement of the child to insure her safety. A second Shelter Care hearing was held on May 31, 2011[,] continuing SAT in the temporary custody of the Agency. SAT was adjudicated dependent at the Adjudication/Disposition hearing on July 26, 2011. The Child

was placed in Kinship Care with maternal great aunt and uncle, [L.P. and D.P.] A Child Permanency Plan was approved with reunification as its primary goal. Mother successfully completed her plan and SAT was released into Mother's physical custody. On January 31, 2012, legal custody was returned to Mother and the Court terminated supervision.

Unfortunately, following the release of custody, Mother's behavior again deteriorated. The reunification lasted approximately 16 months. The Agency received reports of Mother's excessive drinking, Mother's visits to her paramour in prison while SAT was home alone, and Mother's inappropriate parenting. Following these reports, the Agency attempted to contact Mother. In response to the Agency's messages, Mother stated she did not have a caseworker and did not want one. Mother refused to meet with caseworkers, allow caseworkers into the home, or talk to caseworkers without being able to record the conversations. Consequently, the caseworker visited SAT at school. SAT was approximately seven years of age at the time. When the caseworker attempted to speak with her, SAT stated, "I have the right to refuse to speak with you without a lawyer, a parent, and a recording device present." SAT then stated she did not want to be taken away, immediately left the room, and ran down the hallway.

Based on these reports and events, the Agency filed a Petition for Emergency Protective Custody of SAT on May 31, 2013. A hearing was set for June 25, 2013. On June 3, 2013, the Agency was alerted that Mother reportedly planned to leave the state to flee from Court jurisdiction and the Agency before the hearing. As a result, the Agency filed a second Petition requesting immediate temporary placement. The Court granted the temporary relief and SAT was placed into the temporary custody of the Agency. The Shelter Care hearing was held on June 11, 2013. SAT was found to be a dependent child on July 9, 2013, and a Child Permanency Plan was approved. The components of Mother's plan included mental health, drug and alcohol, to remain crime free, parenting, income, housing, and commitment. SAT was again placed in kinship care with the Resource Family with whom she resided during her first placement.

Upon SAT's second placement, Mother's behavior continued to decline. She lacked sufficient income, lost her

- 3 -

housing, continued her substance abuse, and was incarcerated several times. N.T. 3/24/15, 164. She continued to manipulate the system and abuse drugs and alcohol. Although she participated in therapy sessions, she was not invested in the process and made little progress. Mother admitted she really never changed her behavior over the last few years, but manipulated how the Agency viewed her in order to complete her plan. N.T. 3/24/15, 163-166. As her paranoia increased, she remained uncooperative with the Agency. In August of 2014, Mother was charged with receiving stolen property and incarcerated for three weeks. After her release, Mother entered NLFG to address her substance abuse issues.

The Agency caseworker testified that upon SAT's second placement, SAT became more and more upset with Mother and during visits went in to a "coping mode." Visits were suspended from August 5, 2014, through September 2, 2014, due to Mother's incarceration and NLFG's subsequent initial "black out" period. Since Mother's treatment began at NLFG, the caseworker started to note a change in Mother's behavior. She testified that Mother is now attempting to make a true connection with SAT. SAT has thrived in her current placement. She maintains a structured daily routine, is gradually improving in school, and participates in several extracurricular activities. Her Resource Family makes sure she gets any additional help with school work and is active in her therapy.

Orphans' Court Memorandum Opinion, 7/10/15, at 1–5 (footnotes omitted).

On July 10, 2015, the orphans' court entered a decree terminating Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), [(5)], and 8.[2] Mother timely filed a notice of appeal on August 10, 2015, along with a concise statement of errors complained of on appeal pursuant to

_____

[2] On July 10, 2015, the orphans' court also terminated the parental rights of Child's father, W.D.M., III ("Father"), pursuant to 23 Pa.C.S. § 2511(a)(1) and (2). Father has not filed an appeal, nor is he a party to the present appeal.

Pa.R.A.P. 1925(a)(2)(i) and (b).[3]  On September 10, 2015, counsel filed a petition to withdraw and **Anders** brief.  Mother did not file a *pro se* brief or retain alternate counsel for this appeal.

Pursuant to **Anders**, when counsel believes an appeal is frivolous and wishes to withdraw representation, he or she must do the following:

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record . . ., counsel has determined the appeal would be frivolous;
>
> (2) file a brief referring to anything that might arguably support the appeal, but which does not resemble a "no-merit" letter or *amicus curiae* brief; and
>
> (3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed **pro se** or raise any additional points he deems worthy of the court's attention.

*In re: S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (emphasis in original) (citation omitted).  In **In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992), this Court extended the **Anders** principles to appeals involving the termination of parental rights.

"When considering an **Anders** brief, this Court may not review the merits of the underlying issues until we address counsel's request to

---

[3]  Mother originally filed a notice of appeal and a Pa.R.A.P. 1925(b) statement on July 22, 2015, in the Lancaster County Court of Common Pleas Juvenile Division and docketed in this Court at 1251 MDA 2015.  This filing was in error, however, because the proper division to appeal an orphans' court matter in Lancaster County is the Office of the Register of Wills.  On August 10, 2015, Mother timely filed an appeal and Rule 1925(b) statement with the appropriate division.  The action at 1251 MDA 2015 was discontinued on October 13, 2015.

withdraw." ***S.M.B.***, 856 A.2d at 1237. In ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009), our Supreme Court addressed the second requirement of ***Anders***, *i.e.*, the contents of an ***Anders*** brief, and instructed that the brief must:

(1)  provide a summary of the procedural history and facts, with citations to the record;

(2)  refer to anything in the record that counsel believes arguably supports the appeal;

(3)  set forth counsel's conclusion that the appeal is frivolous; and

(4)  state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361. "After an appellate court receives an ***Anders*** brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." ***S.M.B.***, 856 A.2d at 1237 (citation omitted). With respect to the third requirement of ***Anders***, that counsel inform the defendant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to [his] petition to withdraw a copy of the letter sent to [his] client advising

- 6 -

him . . . of [his] rights." ***Commonwealth v. Millisock***, 873 A.2d 748, 752 (Pa. Super. 2005).[4]

Here, counsel has complied with each requirement of ***Anders***. Counsel indicates that she conscientiously examined the record and determined that an appeal would be frivolous. Further, counsel's ***Anders*** brief comports with the requirements set forth by the Supreme Court of Pennsylvania in ***Santiago***. Finally, the record contains a copy of the letter that counsel sent to Mother, advising her of her right to proceed *pro se* or retain alternate counsel and file additional claims, and stating counsel's intention to seek permission to withdraw. Accordingly, counsel has fulfilled the procedural requirements for withdrawing from representation. Thus, we will now review Mother's claim on appeal regarding the termination of her parental rights.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9

---

[4] On September 14, 2015, counsel filed a copy of her letter to Mother, dated July 22, 2015, in compliance with ***Commonwealth v. Millisock***, 873 A.2d 748 (Pa. Super. 2005). In response to this Court's September 18, 2015 order, on September 24, 2015, counsel filed a certificate of service for the ***Anders*** brief and petition to withdraw as counsel.

A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id*.; *R.I.S.*, 36 A.3d [567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel-Bassett v. Kia Motors America, Inc.*, ---Pa. ---, 34 A.3d 1, 51 (2011); *Christianson v. Ely*, 575 Pa. 647, 654, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re: R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The termination of parental rights involves a bifurcated analysis, governed by Section 2511 of the Adoption Act.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the matter *sub judice*, the orphans' court terminated Mother's parental rights under sections 2511(a)(1), (2), (5), (8), and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal

or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).

This Court may affirm the orphans' court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *In re M.T.*, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*). Because the orphans' court addressed the evidence supporting termination under only section 2511(a)(8), and because we agree with the orphans' court decision to terminate Mother's parental rights pursuant to that subsection, we need not address the remaining subsections of the Adoption Act. *See In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011) (observing that if we agree with the trial court's decision as to termination of parental rights under any subsection of 23 Pa.C.S. § 2511(a), we need not address the remaining subsections).

With regard to termination under subsection (a)(8), the orphans' court first referenced the uncontested fact that "[Child] was removed from

- 10 -

Mother's care by the Court for the second time in her young life in June 2013, and that more than 12 months have passed since placement." Orphans' Court Memorandum Opinion, 7/10/15, at 7. The court next assessed whether the conditions leading to Child's placement with the Agency have persisted and considered the following evidence:

> Mother was unable to parent SAT when the termination proceedings began. Despite her current progress, Mother is still learning how to maintain boundaries and develop tools for raising a daughter and managing her addiction issues. She has yet to remedy the reasons SAT was placed in care 24 months ago. Mother waited too long to start any significant or meaningful attempts to complete her plan.[16] SAT is really no closer to returning home than she was when she was originally placed. Termination does not require evaluating Mother's willingness or ability to remedy the conditions that initially caused the placement. It was her continued inability to complete her plan and cooperate with the Agency which allowed SAT to remain in care for a period of 24 months. The possibility that Mother might now be on track to complete her plan in a few years cannot cause SAT to remain in care indefinitely. SAT's life "simply cannot be put on hold in the hope that [Mother] will summon the ability to handle the responsibility of parenting." In re Z.P., 994 A.2d 1108, 1125 (Pa. Super. 2010). Consequently, the [orphans' court] finds that clear and convincing evidence has been established that Mother's deficiencies and the reasons for SAT's placement continue to exist.

> [16] Mother has failed to demonstrate significant progress toward her plan. Mother's [Permanency Plan] goals for reunification call on her to improve mental health functioning to the extent that she can care for her child; to remain free from drugs and misuse of alcohol; to remain crime free; to learn and use good parenting skills; to be financially stable in order to provide for herself and her child; to obtain and maintain a home free and clear of hazards for herself and her child; [and] to maintain an ongoing commitment to her child. *See* Petitioner's Exhibit #1 7/9/13.

- 11 -

Orphans' Court Memorandum Opinion, 7/10/15, at 12–13.

The orphans' court then addressed "the statutory consideration under (a)(8) requir[ing] the Court to find that termination would best serve the needs and welfare of this Child." Orphans' Court Memorandum Opinion, 7/10/15, at 13. As noted,

> [W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

The orphans' court made the following observation as to its needs-and-welfare-of-the-child analysis under subsection (a)(8): "The [c]ourt has briefly touched upon the best interest standard in its above analysis. However, since the [c]ourt must also consider what is in the best interest of the child under Section 2511(b), the remainder of this Opinion will continue with that analysis." Orphans' Court Memorandum Opinion, 7/10/15, at 13. While this language could indicate that the orphans' court improperly conflated its section 2511(a)(8) needs-and-welfare discussion with its section 2511(b) analysis, a careful reading of the court's memorandum opinion demonstrates that it adequately conducted a discrete section (a)(8) needs-and-welfare review. Notably, the orphans' court's section 2511(a)(8) examination included findings that: (1) "Child has been involved with the Agency and [the c]ourt for more than half of her life;" (2) although Mother

- 12 -

had made significant personal progress "her recovery is separate from [Child's] need to recover from the harm she has suffered throughout her life as a result of Mother's issues; (3) Mother does not recognize the "need to place [Child's] interests above her own;" and (4) Mother does not appreciate the damage to Child. *Id*. at 10–11.

The orphans' court also detailed the impact on Child if she was reunited with Mother:

> SAT needs a loving and stable home. Mother's solution is to have SAT join her at her rehabilitation facility. This would mean SAT would move to the NLFG facility to share a room with not just Mother but also with other women in the program. It would require a change of school, change of therapist, change of home. In the best case scenario, SAT and Mother would be in the treatment facility for no less than a year, but would then have to transition into living outside the facility, guaranteeing all those changes would again occur just a year later. During that two year interval, SAT would experience a lot of transition, a lot of waiting just to have the type of stable environment she has now. Even then, there is still the possibility of another failed attempt at reunification.

> \* \* \*

> Because of her substance abuse issues, Mother's priority has been, will be, and should be on her recovery. Her conversation is centered on her goals, her program requirements, and her hopes for the future, with little awareness or understanding of SAT's goals, hopes, and needs. SAT needs to deal with her own issues, and that begins with insuring permanency and stability in her life. While Mother's attitude and participation in visits has greatly improved, Mother structures the activities and the focus remains on her. She does not ask about SAT's homework or things she is engaged with at school. It is difficult to believe SAT's needs will be able to take priority at this early stage of Mother's recovery. To require SAT to move to NLFG would, once again, displace SAT's needs and interests in favor of Mother's.

Orphans' Court Memorandum Opinion, 7/10/15, at 11–12 (record reference and footnotes omitted).

Our review reveals that the orphans' court's factual findings that twelve months or more have elapsed from the date of Child's removal, that the conditions leading to Child's removal continue to exist, and that termination of Mother's parental rights would best serve the needs and welfare of Child are supported by the record. Moreover, the court's section 2511(a)(8) analysis comports with the law. We therefore turn to the orphans' court needs-and-welfare evaluation under section 2511(b).

Our Supreme Court recently stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

The orphans' court set forth its section 2511(b) needs-and-welfare scrutiny as follows:

In analyzing the best interest of the child, the Court relied on Dr. Suzanne Ail's testimony and bonding assessment and the recommendations of the Guardian Ad Litem and the child's therapist in favor of termination. There is no question, based

- 14 -

upon the record, that termination of Mother's parental rights is in the best interest of SAT and that the effect of that termination will not be harmful to SAT.

The Agency presented the testimony of Dr. Ail who testified that the status of the bond between Mother and SAT is attenuated. Mother's failure to do what was necessary to reunite with SAT over the past two years, followed years of instability which has had a devastating impact on SAT's relationship with Mother. While Mother is making some progress, her focus is still on what she needs to do in her recovery. There has not been a lot of focus on the needs of SAT or that SAT's recovery is going to require as much depth and time as Mother's.

Dr. Ail's report states, "[t]he chronicity and severity of [Mother's] substance abuse and mental illness has badly compromised SAT's attachment to her mother. She has repeatedly witnessed firsthand her mother's reactivity, emotional manipulativeness, and physical violence." SAT has had to live with uncertainty and had to endure the effects of Mother's relapses. The result of which has manifested in SAT's actions toward Mother: "I was expecting there to be anger, but what I saw was very intense and unrelenting, and that . . . concerned me about how deep that injury went."

While Dr. Ail concluded that Mother and SAT do have a bond, her report noted that the bond between SAT and the Resource Family is more significant. She testified that the Resource Family is more effective in providing limits and structure. She did not see the same anger and ambivalence with them that she saw with Mother, which would lead to challenging behavior. When SAT became disgruntled, the Resource Parents remained calm and firm and she was able to regroup. Dr. Ail testified that SAT has a veneer of resiliency, which only predictability and consistency can help strengthen.

The effects of Mother's actions have traumatized SAT and that damage manifests in her behavior. She is still so unsure of the permanence of her current circumstances that she will not go to bed unless the Resource Mother lays down with her until she falls asleep. SAT becomes fearful if her Resource Family leaves her for an overnight or weekend. SAT's teachers have reported that she has lacked confidence, has cried in school, and has indicated she did not think she could do anything. She needs

the stability of a family and a home, without the continuing threat or chance of being removed. There will not be any comfort and stability in SAT's life until she knows that she is in a safe and permanent home.

SAT's therapist, Kellie Jacobs, testified that SAT has made significant progress in therapy with the help of her Resource Family, who have taken an active role in SAT's treatment. While acknowledging SAT is flourishing in their care, Ms. Jacobs stated [she] does not believe SAT can survive another failed attempt at reunification. Her hard won resiliency is still fragile and dependent on the stability of her current placement. Ms. Jacobs believes that Mother's "manipulativeness, lack of accountability, failure to support her daughter's treatment, paranoia, and inability to make choices congruent with her daughter's best interest" have left a residual negative impact on SAT that manifests in an ambivalent attachment to Mother.

Both Karen Kelly, Assistant Director of NLFG, and Rebecca Kern, Mother's mentor at NLFG, testified to Mother's substantial progress and rehabilitation. The testimony was probative as to the progress Mother has made and the potential for her to continue that progress. However, the Court does not find their testimony compelling or instructional in its decision on whether to terminate Mother's parental rights. Their testimony centered on [the] NLGF (sic) program, Mother's drug and alcohol rehabilitation, and Mother's desire to have SAT at the rehab facility. Neither witness has met SAT nor has any knowledge of her needs outside of what Mother reports to them.

Conversely, the Court found the testimony of Dr. Ail and Ms. Jacobs credible and persuasive. This child needs permanency and stability. SAT's development has been consistently disrupted in one way or another by Mother. While SAT does have a bond with Mother, it is not particularly meaningful or beneficial to SAT. It is clear from the evidence and testimony presented that this child has been adversely affected by Mother's substance abuse and mental illness. It is equally clear that she appears to have found stability in her current kinship resource home. The Resource Family has been a longstanding and consistent stabilizing factor in SAT's life. Their commitment has been unwavering, unlike Mother's. SAT flourishes in their care and demonstrates a strong attachment to them, which is both meaningful and beneficial to her welfare.

This bond should not be disrupted. She is in a pre-adoptive home that offers her the love, stability, and permanence which Mother has not been able to consistently provide to her.

The Resource Family remain[s] supportive of Mother, affirming her potential. They are committed to maintaining SAT's relationship with Mother and open to future possibilities should Mother maintain her current progress of stability and sobriety. They have indicated their willingness to allow Mother and SAT to continue to have contact, subject to the recommendation of SAT's therapist. Dr. Ail and Ms. Jacobs testified they would recommend contact in the future if Mother continues her current progress.

SAT has been in the custody of the Agency for over two years. Her life has finally begun to stabilize. She needs to remain in the home of her Resource Family. This child deserves the peace, comfort, and safety of knowing her current home is more than a temporary one. Termination of parental rights in furtherance of adoption by her great aunt and uncle is in her best interest. To deny or further delay the stability and permanence that adoption would provide would be detrimental to SAT's physical and emotional wellbeing. It is important that her current home is not a place of transition, but a forever home, where all of her needs will be met, and where she can flourish under the love, supervision and guidance of her great aunt and uncle.

Orphans' Court Memorandum Opinion, 7/10/15, at 14–18 (record references and footnotes omitted).

Again, the orphans' court's factual findings are supported by the record, and its legal conclusions are not the result of an error of law or an abuse of discretion. Accordingly, we concur with the orphans' court's analysis with regard to section 2511(b).

Finally, we are mindful that once satisfied that counsel has complied with the **Anders** requirements, this Court undertakes an independent

- 17 -

examination of the record to determine whether the appeal is wholly frivolous. **S.M.B.**, 856 A.2d at 1237. Thus, it is incumbent upon us to discuss the issue raised in Mother's Pa.R.A.P. 1925(b) statement that the orphans' court erred in terminating her parental rights "when expert testimony was clear that Mother and child should remain in contact with each other, thus termination of parental rights was not in the best interests of the child under 25 Pa.C.S. 2511(b)." Mother's Pa.R.A.P. 1925(b) statement, 8/10/15, at unnumbered 1.

We previously recounted the orphans' court's thorough discussion of the expert testimony in this matter recommending that Mother's parental rights to Child be terminated and concluded that the court's termination decision under section 2511(b) was factually supported and legally sound. Regarding Mother's specific claim that the expert testimony regarding the possibility of future contact between Mother and Child contraindicates a conclusion that termination was in Child's best interest under section 2511(b), the orphans' court concluded:

> The expert testimony does not state that Mother and child must or should remain in contact. The testimony is quite clear that the experts are in agreement that parental rights should be terminated and that any future contact is contingent upon Mother maintaining her sobriety, SAT's therapist recommendation, and the continued approval of SAT's Resource Family. Whether or not there will be future contact and what that contact will be is unknown at this time. That decision will be based upon what is in SAT's best interest. In fact, the expert testimony of both . . . Dr. Suzanne Ail and Ms. Kellie Jacobs revealed that Mother and Child need some time apart to deal with their issues and that

maybe they can renew a relationship in the future. Dr. Ail testified:

> I believe that if [Mother] is able to run the course well and do what she needs to do and [SAT] is given the space and place that she needs, I really believe there is a strong likelihood that they will move toward a better place of reconciliation, and I think it is quite possible that, as an adult or even as a late adolescent, [SAT] would be seeking out more time with [Mother] and an even closer relationship with [Mother] . . . I don't think [SAT] and [Mother] can do that work in conjunction at this particular point with the two of them together.

> * * *

> The expert testimony and the gracious decision of the Resource Family to remain open to the idea of conditional contact between SAT and Mother certainly cannot to be construed as clear evidence that termination of parental rights is not in SAT's best interest.

Orphans' Court Opinion Sur Appeal, 8/5/15, at unnumbered 2. The orphans' court's assessment of the expert testimony is supported by the record and is free from legal error. Accordingly, Mother's argument that the expert testimony can be construed favorably as to retention of her parental rights is without merit.

Therefore, after a careful and independent review of the record, and identifying no other non-frivolous issues, we conclude that the orphans' court's findings are supported by clear and convincing, competent evidence, and that it reasonably concluded that the elements of section 2511(a)(8) and (b) were met by the facts before it. We discern no abuse of discretion or error of law in this decision. Accordingly, we affirm the orphans' court's

J-S05017-16

decree terminating Mother's parental rights, and we grant the petition to withdraw as counsel.

Decree affirmed. Petition to withdraw as counsel granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/26/2016

- 20 -